UNDER SEAL

Jason Hain (State Bar No. 295721)
LAW OFFICES OF JASON HAIN
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: 831-227-6892
Facsimile: 415-795-9692
jason@jasonhainlaw.com

*Attorney for RELATOR*
KARLA ABEA



FILED #99
ifp

OCT 15 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES ex rel. KARLA ABEA

    RELATOR,

vs.

DEBBIE ODIYE, GODWIN ODIYE and DOES 1
through 50, inclusive,

    Defendants.

Case No. CV 18 6296 KAW

COMPLAINT FOR:

1. Violation of 31 U.S.C. § 3729 et seq.
2. Fraud
3. Violation of Penal Code § 496
4. Breach of Covenant of Quiet Enjoyment
5. Unlawful Business Practices
6. Common Count
7. Intentional Infliction of Emotional Distress
8. Negligence/Personal Injury
9. Nuisance
10. Breach of the Warranty of Habitability
11. Violation of Civil Code § 1940.9
12. Breach of Contract
13. Violation of Civil Code § 1942.4

**FILED UNDER SEAL**

**JURY TRIAL DEMANDED**

COMES NOW, QUI TAM RELATOR, KARLA ABEA ("RELATOR"), who states the following in her complaint against Defendants DEBBIE ODIYE, GODWIN ODIYE:

**JURISDICTION AND VENUE**

1.     This action arises under the laws of the United States to redress violations of the Federal False Claims Act, 31 U.S.C. §3729 *et seq.* ("FCA").

2.      Subject-matter jurisdiction is conferred by 31 U.S.C. §3732(a) and 28 U.S.C. §1331.

3.      The Court has personal jurisdiction over all of the Defendants because they are all located within the Northern District of California and act as providers of property management services and housing within the Northern District of California. Each Defendant regularly performs duties of property managers or landlords, and accordingly, is subject to the jurisdiction of this Court.

4.      The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Defendants' Fraud, Violation of Penal Code § 496, Breach of Covenant of Quiet Enjoyment, Unlawful Business Practices, Intentional Infliction of Emotional Distress, Negligence/Personal Injury, Nuisance, Breach of the Warranty of Habitability, Violation of Civil Code § 1940.9, Breach of Contract, Violation of Civil Code § 1942.4, and Common Counts because Defendants' California Law violations and their violations of the Federal False Claims Act arise from the same transactions or occurrences. The Court also has pendant jurisdiction over Defendants' California Law violations because these violations and Defendants' violations of the Federal False Claims Act arise out of a common nucleus of operative fact.

5.      Venue lies under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because Defendants contract business within this district, the facts forming the basis of this complaint occurred within this district and the property which is the subject of this action is situated within this district.

6.      The facts and circumstances of the Defendants' violations of the Federal False Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.

7.      RELATOR is the original source of the information upon which this Complaint is based, as that phrase is used in the Federal False Claims Act, and she provided disclosures of the allegations of this Complaint to the United States prior to filing.

8.      Immediately upon filing the Complaint, RELATOR will provide the United States Attorney General with a copy of this Complaint and written disclosure of substantially all material evidence and information RELATOR possesses.

**PARTIES**

9.     Qui Tam Relator KARLA ABEA brings this action on her own behalf and on behalf of the United States of America to recover civil damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* RELATOR is a residential tenant of "upper unit", (hereinafter "Subject Premises") located at 371 Staples Avenue, San Francisco, California (hereinafter "Subject Property") which was a single-family home that has been divided into two units which share one electricity, gas and water meter. At all times relevant to this Complaint, RELATOR was a Section 8 voucher recipient; thus, RELATOR's tenancy was subsidized by the Federal Government and subject to Department of Housing and Urban Development regulations and all applicable Federal law.

10.     RELATOR is informed and believes, and thereon alleges, that Defendants DEBBIE ODIYE and GODWIN ODIYE were the owners of the Subject Property at all times relevant to this action to the date of filing of this Complaint.

11.     RELATOR is informed and believes, and thereon alleges, that Defendants DOES 1-50 at all times relevant to this action, were responsible for management, maintenance and care of the Subject Property and Subject Premises, each was thus a "landlord" and was responsible in some manner for the occurrences herein alleged, and that RELATOR's damages as herein alleged were proximately caused by her.

12.     When the term "Defendant" is used herein, it shall refer to Defendant DEBBIE ODIYE. When the term "Defendants" is used herein, it shall refer to Defendant DEBBIE ODIYE, GODWIN ODIYE and the DOE Defendants.

13.     RELATOR communicated on a routine basis with Defendant and her agents concerning RELATOR's tenancy at the Subject Premises.

14.     The true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, whether individual, corporate, associate, or otherwise, are unknown to RELATOR who therefore sues such Defendants by such fictitious names. When their true names and capacities are ascertained, RELATOR will amend this Complaint by asserting their true names and capacities herein. RELATOR is informed and believes, and thereon alleges, that each of the fictitiously named Defendants are

responsible in some manner for the occurrences herein alleged, and that RELATOR's and the Government's damages as herein alleged were proximately caused by those Defendants.

15.     RELATOR is informed and believes, and thereon alleges, that in doing the things herein alleged, the Defendants, and each of them, including without limitation the DOE Defendants, were acting as the agents, employees and/or principals of their co-defendants, and were generally acting within the course and scope of their agency and employment.

16.     RELATOR is informed and believes, and thereon alleges, that at all times relevant herein, each employer of employees had advanced knowledge of the unfitness of the employee and employed them with conscious disregard of the rights or RELATOR and others and authorized and/or ratified the wrongful conduct and/or was personally guilty of oppression, fraud, or malice.

## OPERATIVE FACTS

17.     At some point prior to Relator's tenancy, the single-family home which contains the Subject Premises was illegally subdivided as the ground floor was converted into a second unit. Both units have shared the same electricity, gas and water meters.  On January 11, 2016, the Subject Property was legally certified to contain two residential units.

18.     RELATOR has continually occupied the Subject Premises from her initial occupancy on or around November, 2010 through the present.  RELATOR has resided in the Subject Premises in excess of one year as a tenant.

19.     In order for the subject tenancy to be eligible for Section 8 tenant-based housing assistance payments, RELATOR and Defendant were required to enter into an agreement concerning the basic terms of the tenancy on a form entitled Request for Tenancy Approval and submit it to the San Francisco Housing Authority (hereinafter "Housing Authority" or "SFHA").  The Request for Tenancy Approval provided that Defendant would be financially responsible for all electricity, gas and water costs resulting from the proposed tenancy, was signed by RELATOR and Defendant or her agent and received by the Housing Authority in or about October 2010.

20.     In order for the subject tenancy to be eligible for Section 8 tenant-based housing assistance payments, RELATOR and Defendants were required to enter into a written lease agreement ("Lease")

COMPLAINT FOR VIOLATION OF 31 U.S.C. § 3729, OTHER CAUSES AND JURY DEMAND
Page 4 of 23

which they did in October 2010.  Pursuant to the Lease, upon executing the Lease and taking possession of the Subject Premises, RELATOR paid Defendants $2,500 as security deposit.  The Lease provided that rent would be $2,400 per month and RELATOR would have one parking space in the garage and exclusive use of the backyard.  The Request for Tenancy Approval together with the Lease shall here be referred to as the "Agreement."

21.     In order to be eligible for Section 8 tenant-based housing assistance payments, Defendants were required to enter into an agreement with the Housing Authority entitled Housing Assistance Payments Contract (hereinafter "HAP Contract").  The HAP Contact provided additional obligations that Defendants would have to RELATOR and the Housing Authority which Defendants agreed to meet as conditions to remaining eligible for the housing assistance payments.  Although the HAP Contract was not signed, Defendants understood they would need to comply with its terms in order to receive housing assistance payments.  Defendants thereafter consummated the HAP Contract by accepting housing assistance payments from the Housing Authority with knowledge of its terms.  A true and correct copy of the Agreement and an attached incomplete portion of the HAP Contract is attached hereto as Exhibit 1.

22.     Effective November 1, 2010, SFHA set its payment at $1,472 the amount of Relator's payment to $928 per month.  On December 1, 2010, SFHA increased its payments to $1,940 and increased the amount of Relator's payment to $460 per month.  On March 1, 2011, SFHA increased Relator's portion to $726 and decreased the subsidy to $1,674.  On December 1, 2012, SFHA decreased Relator's portion to $226 and increased the subsidy to $2,174.  On February 1, 2014, SFHA increased Relator's portion to $709 and decreased the subsidy to $1,691. On March 1, 2014, SFHA decreased Relator's portion to $109 and increased the subsidy to $2,291.  On October 1, 2014, SFHA increased Relator's portion to $310 and decreased the subsidy to $2,090.  On April 1, 2015, SFHA increased Relator's portion to $672 while the subsidy remained $2,090.  On June 1, 2015, SFHA decreased Relator's portion to $310 while the subsidy remained $2,090.  On March 1, 2016, SFHA increased Relator's portion to $1,262 and decreased the subsidy to $1,500.  On April 1, 2016, SFHA increased Relator's portion to $1,318 and increased the subsidy to $1,725.  On December 1, 2016, SFHA increased Relator's portion to $1,392 and increased the subsidy to $2,195.  On April 1, 2017, SFHA decreased Relator's portion to $934 and increased the

subsidy to $2,653. On May 1, 2018, SFHA decreased Relator's portion to $441 and increased the subsidy to $3,486.

23.     However, when RELATOR took occupancy of the Subject Premises, Defendants refused to pay for any of the utilities to the Subject Premises and required RELATOR to arrange for payment for electricity, gas and water services to the entire Subject Property.  Defendant never offered RELATOR any reimbursement for such costs.  From the beginning of RELATOR's tenancy through July 23, 2018, RELATOR was forced to pay for electricity, gas and water service to both units at the Subject Property and seek reimbursement for amounts spent on utilities used in the lower unit from the occupants thereof.  Both RELATOR and the Housing Authority reminded Defendant several times that Defendant was required to put the electricity, gas and water accounts in Defendants name and refrain from charging Relator for electricity, gas and water use within the Subject Premises.

24.     On June 4, 2018, an inspector from the Housing Authority cited Defendants for RELATOR paying the utilities for a unit which was not separately metered.  On or about July 3, 2018, Sabrina Cheek, a housing inspector of the Housing Authority performed an inspection of the Subject Premises.  Shortly hereafter, the Housing Authority issued a Notice to Defendant citing Defendant for lack of functioning smoke detectors, cracked paint on ceiling, and damaged exterior stairs at the Subject Premises as well as "SINGLE FAMILY UNIT WITH AN IN-LAW ONLY 1 METER OWNER MUST HAVE UTILITIES IN THEIR NAME, OWNER MUST PROVIDE COPY OF ELECTRICITY, GAS AND WATER BILL AND TENANT MAY NOT PAY ANY PORTION OF UTILITES SF 7/3/2018 UTILITIES NOT TRANSFERRED TO OWNER'S NAME ABATE SF", indicating that the Housing Authority then intended to abate payment of housing assistance due to the violation regarding payment of utilities.  Shortly thereafter, the Housing Authority did abate housing assistance payments for one or two months, which finally convinced Defendants to comply with Section 8 regulations and the HAP Contract by putting the electricity, gas and water accounts for the Subject Property in Defendant's name.

25.     At various times throughout RELATOR's tenancy, the Subject Premises was not up to code due to habitability defects including but not limited to toxic biological contaminants, water leaks, dilapidated flooring, lack of hot water heater, and lack of functioning appliances.

26.    On June 23, 2014, Inspector Bragg of San Francisco Department of Building Inspection inspected the Subject Property and found water intrusion, toxic biological contaminants, damaged flooring and an illegal kitchen in the unit below the Subject Premises.  On June 27, 2014, Inspector Bragg mailed a Notice of Violation #201481052 to Defendant which ordered Defendant to abate those violations by July 28, 2014.  Because that was not done, a final warning letter was set by San Francisco Department of Building Inspections to Defendant on July 28, 2014.  Those violations were not abated until August 18, 2014 at which time Inspector Bragg inspected the Subject Premises and confirmed the violations had been abated.

27.    On May 13, 2015, Inspector Mak of San Francisco Department of Building Inspection inspected the Subject Property and found that there was no functioning hot water heater, damage to ceiling in water heater room, and there was toxic biological contaminants in the Subject Premises.  Inspector Mak sent Defendant Notice of Violation #201546931, for those violations the following day.  On June 18, 2015, Inspector Mak reinspected the Subject Property and found that the hot water heater had been replaced and the ceiling in the water heater room repaired but that the toxic biological contaminants violations he had cited still remained unabated.  On July 23, 2015, Inspector Mak reinspected the Subject Property and found that all of the violations he had cited had been abated.

28.    In September 2015, Defendants no longer provided RELATOR with a parking space and caused the backyard to be shared between RELATOR and other of Defendants' tenants at the Subject Property. Defendants have continued to deprive RELATOR of these two amenities despite written communications from RELATOR informing Defendant that Defendant is required to provide them under the Agreement and HAP Contract.

29.    Although RELATOR paid $2,500 security deposit stated in the October 2010 lease, Defendant has claimed that RELATOR paid only $2,000 and has demanded RELATOR pay an additional $500 toward the security deposit.

30.    Defendant illegally entered the Subject Premises on multiple occasions without giving proper advance notice.

31.    Defendant's failure to maintain and repair the Premises was negligent and intended to cause

RELATOR to vacate the Premises.

32.     Defendants' failure to pay the electricity, gas and water bills as Defendant promised the San Francisco Housing Authority was done with the intent to fraudulently enrich themselves.

33.     Defendants were at times fully aware that they, acting as managers and operators at the property, had failed to maintain it to the standard of habitability as required by law.  In addition to the foregoing substandard and defective conditions, including water intrusion and resulting contaminants, Defendants were, at all times relevant, aware that the Subject Premises and its grounds lacked other necessary characteristics to be a habitable dwelling including but not limited to infestations toxic biological contaminants.

34.     Despite RELATOR's continued requests, the defective conditions went unabated throughout much of her tenancy.

35.     RELATOR did not cause or contribute to the substandard conditions described herein and had fulfilled her obligations as a tenant at all times.

36.     Defendant had actual and constructive knowledge of these conditions at the Subject Premises and failed to cure the conditions listed herein. RELATOR notified Defendants of the defective conditions with no effective response.

37.     Throughout her occupancy of the Subject Premises, RELATOR repeatedly notified Defendant and/or her agents, of the defective and dangerous conditions listed above, among others, and requested that Defendant have them repaired.  Despite these requests Defendants, and each of them, failed and/or refused to repair the conditions in a timely manner, and/or have done so in a negligent and/or unreasonable fashion and in bad faith.

38.     Defendants exhibited wanton and blatant disregard of these unsanitary and uninhabitable conditions, as most were manifestly visible to the untrained observer.

39.     Defendant did not perform her obligations under the Agreement in ways that include, but are not limited to the following:

    a.    Breaching the warranty of habitability by not making the needed repairs;

    b.    Failing to maintain the Subject Premises in a safe and habitable condition; and

---

      c.  Forcing RELATOR to pay for electricity, gas and water service which was used within the Subject Premises and refusing to put the electricity, gas and water account in her name.

40.    Defendants breach the HAP Contract by accepting side payments from Relator and reducing housing services which Defendant's promised to provide including, removing Relator's parking spot, ceasing to provide exclusive use of the backyard, and storing Defendants' possessions in areas rented to Relator.

41.    As a direct and proximate result of the above conduct and resultant conditions in the Premises, RELATOR has suffered and continues to suffer severe physical, mental, and emotional pain, injury and distress, including, but not limited to, respiratory ailments, shortness of breath, wheezing, coughing, eye irritation, interrupted sleep, general discomfort and fatigue, embarrassment, humiliation, discomfort, exacerbation and annoyance, all to her general damage in an amount to be proven at trial.

42.    As a direct and proximate result of the above acts by Defendants, and each of them, RELATOR paid excessive rent and electricity, gas and water payments for the Subject Premises during the length of her tenancy.

43.    As a direct and proximate result of the above acts by Defendants, and each of them, Defendants fraudulently induced the Government to make excessive subsidy payments to Defendant.

44.    As a direct and proximate result of the above-mentioned conduct, RELATOR has suffered and continues to suffer damages, all in an amount to be proven.

45.    As a direct and proximate result of the above conduct, RELATOR has suffered and continues to suffer the loss of use of the Subject Premises, attorney fees, and other special damages.

46.    By way of RELATOR's long-term tenancy and regular monthly payment of rent, RELATOR was also a common law tenant of the Subject Premises.

47.    As a direct and proximate result of the above mentioned conduct, RELATOR has suffered damages, all in an amount to be proven.

48.    As a direct and proximate result of the above conduct, RELATOR has been forced to incur attorney's fees.

49.    As a direct and proximate result of the above acts by Defendants, and each of them, RELATOR

49.     As a direct and proximate result of the above acts by Defendants, and each of them, RELATOR paid excessive rent for the Subject Premises for over one year.

50.     By demanding and taking side payments from RELATOR, Defendants breached the HAP Contract and violated Department of Housing and Urban Development regulations and the Federal False Claims Act.

51.     Defendants engaged in the above-described conduct with the knowledge that the conduct was without right or justification and without regard for the fact that it would cause financial harm to RELATOR, notwithstanding their obligation to comply with applicable statutes, Department of Housing and Urban Development regulations, and Defendants' contract with the Housing Authority.  RELATOR is therefore entitled to punitive damages.

## APPLICABLE FASLE CLAIMS ACT LAW

52.     The Federal False Claims Act provides, in pertinent part:

(a)(1) Any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or (C) conspires to commit a violation of subparagraph (A), (B), is liable to the United States government for a civil penalty of not less than $5,500 nor more than $11,000, plus 3 times the amount of damages which the Government sustains as a result of the act of that person.

(b)  For purposes of this section, (1) the terms "knowing" and "knowingly", (A) mean that a person, with respect to information, (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.

53.     A landlord violates the Federal False Claims Act by demanding and receiving payments for housing services when such payments have not been approved by the Government. *Coleman v. Hernandez* 490 F.Supp.2d 278 (2007).

54.     Each time a payment was received in violation of the Federal False Claims Act is a separate violation of the Federal False Claims Act. *United States ex rel. Kreindler & Kreindler v. United*

*Technologies Corp.,* 985 F.2d 1148, 1157 (2d Cir.1993).

## COUNT I
(VIOLATION OF 31 U.S.C. § 3729 et seq.)

55.     RELATOR re-alleges and incorporates herein the allegations of all preceding paragraphs as though fully set forth by this reference.

56.     Defendants received Federal funds from the Housing Authority as subsidies for RELATOR's rental payments pursuant to the Department of Housing and Urban Development's Section 8 Housing Voucher Program.

57.     Defendant endeavored to increase Defendants' profits from RELATOR's tenancy by refusing to pay for RELATOR's electricity, gas and water services and forcing RELATOR to pay for electricity, gas and water services used at the Subject Property, removing RELATOR's parking space, requiring RELATOR to share use of the back yard, demanding additional security deposit money, and storing Defendant's possessions in the Subject Premises. Defendants did so, knowing that Defendants had promised RELATOR and the Housing Authority that Defendants would pay for all of RELATOR's electricity, gas and water costs and would maintain and not intrude on all originally provided amenities and rented spaces as a condition for Defendants being eligible to receive subsidy payments from the Housing Authority.

58.     As a prerequisite for receiving funds through the Section 8 Housing Voucher Program, Defendants were required to agree to pay for all of RELATOR's electricity, gas and water costs to comply with the Department of Housing and Urban Development's regulations pertaining to the Section 8 Housing Voucher Program.

59.     Defendants' promise to pay for Relator's electricity, gas and water bills and refrain from removing RELATOR's parking space, requiring RELATOR to share use of the back yard, demanding additional security deposit money, and storing Defendant's possessions in the Subject Premises was material to the Housing Authority's decision pay Defendant the subsidy.   RELATOR could not afford such bills and the Housing Authority would not have subsidized the subject tenancy in amounts above the Housing Authority's payment standard.

60.     Defendants violated the Federal False Claims Act by submitting a false claim to the Federal

Government when Defendants promised to cover the costs of RELATOR's utilities and refrain from removing RELATOR's parking space, requiring RELATOR to share use of the back yard, demanding additional security deposit money, and storing Defendant's possessions in the Subject Premises. Defendants knew such claim to be false, because shortly after the claim was made, at the outset of RELATOR's tenancy, Defendants forced RELATOR to pay for RELATOR's electricity, gas and water service used at the Subject Property in violation of the HAP Contract, which provided that Defendants would pay for all of RELATOR's electricity, gas and water costs.  Each month for which RELATOR was forced to pay excessive electricity, gas and water costs in this manner was a separate violation of the Federal False Claims Act, as was each month after Defendants began removing RELATOR's parking space, requiring RELATOR to share use of the back yard and storing Defendant's possessions in the Subject Premises.

61.     Defendants, by knowingly conspiring to cause to be made or used false statements or records material to a false claim including, i.e., false certifications or representations of compliance with the Department of Housing and Urban Development's regulations pertaining to the Section 8 Housing Voucher Program, which Defendant caused to be made when Defendant applied for Federal subsidy and entered into the HAP Contract, violated 31 U.S.C § 3729(a)(1)(B) and 31 U.S.C § 3729(a)(1)(C).

62.     Defendants, through their concerted efforts to conspire to illegally exact excessive subsidy payments from the Government violated 31 U.S.C § 3729(a)(1)(A) and 31 U.S.C § 3729(a)(1)(C).

63.     In knowingly conspiring to induce the Government to enter into the HAP Contract, Defendants did not inform the Government that RELATOR would be made responsible to pay her own utilities or that amenities associated with the tenancy would be removed. Through such acts, Defendants conspired to fraudulently induce the Government to believe that Defendants would pay for all electricity, gas and water services used by RELATOR and did cause the Government to so believe while Defendants knew that RELATOR would be charged for RELATOR's own electricity, gas and water usage and that amenities would be removed and thereby violated 31 U.S.C § 3729(a)(1)(A), 31 U.S.C § 3729(a)(1)(B) and 31 U.S.C § 3729(a)(1)(C).

64.     Defendants continued to receive subsidy payments from the Government from the inception of

RELATOR's tenancy through the present with the exception of one or two months in 2018 when the Housing Authority temporarily abated subsidies.

65.     All of the Defendants' conduct described in this Complaint was knowing, as that term is used in the Federal False Claims Act.

66.     By demanding that RELATOR pay for all electricity, gas and water usage at the PROPERTY when Defendants promised Housing Authority that RELATOR would not have to pay for electricity, gas and water usage, Defendants accepted "side payments" from RELATOR, breached obligations to comply with applicable statutes, Department of Housing and Urban Development regulations, and the HAP Contract.

67.     As a direct and proximate result of the above mentioned conduct, RELATOR paid excessive electricity, gas and water costs and rent and the Government was damaged in the full amount of every subsidy payment made to Defendant as Defendant was in breach of the HAP Contract at all times during the subject tenancy.

## COUNT II
### (Fraud)

68.     RELATOR re-alleges and incorporates herein the allegations of all preceding paragraphs as though fully set forth by this reference.

69.     RELATOR was a third-party beneficiary of the HAP Contract between Defendants and the Housing Authority.

70.     In knowingly inducing RELATOR and the Government to enter into the Agreement and the HAP Contract, Defendants represented to the Government and RELATOR that Defendant would pay for all of RELATOR's electricity, gas and water service charges associated with her use of the Subject Premises and would have a parking spot in the garage and exclusive use of the backyard and the interior of the Subject Premises. At no time did Defendants disclose the fact that only one electricity, gas and water meter metered usage for both units at the Subject Property and that RELATOR would be forced to pay the bill generated from that meter and all electricity, gas and water service to the Subject Property or that Defendants planned to construct a second unit at the property which would result in removal of RELATOR's parking space, cause the backyard to be shared with other tenants, and that Defendant

would store her belongings in the Subject Premises. By representing that Defendant would pay for all electricity, gas and water services provided in connection with RELATOR's tenancy and that RELATOR would have a parking space in the garage and exclusive use of the back yard and all spaces within the Subject Premises, Defendants intended to cause RELATOR and the Government to believe those representations and did cause RELATOR and the Government to so believe.

71.     Defendants impliedly represented that they were legally entitled to collect rent for the Subject Premises although it had been illegally subdivided prior to commencement of RELATOR's tenancy. The Subject Property was certified as a two-unit building on January 11, 2016, at which time it became legal to collect rent for the Subject Premises.

72.     Defendants had no reason to believe that their representations were true and knew them to be false.

73.     Defendants intentionally misrepresented facts and omitted disclosures with the intent to induce the Government to sign the HAP Contract and subsidize RELATOR's tenancy and to induce RELATOR to sign the Agreement and pay rent for the Subject Premises.

74.     As a proximate result of the above stated acts of Defendants, RELATOR suffered undue financial burden of the excessive electricity, gas and water bills and excessive rent and actual and special damages as herein alleged.

75.     The aforementioned misrepresentations were designed to mislead RELATOR and were done with the intent to oppress RELATOR; and therefore justify an award of substantial exemplary and punitive damages in an amount to be proven at trial.

### COUNT III
### (Violation of Penal Code Section 496)

76.     RELATOR re-alleges and incorporates herein the allegations all preceding paragraphs as though fully set forth herein.

77.     In forcing RELATOR to pay excessive utilities and rent, Defendants received funds and valuable services from RELATOR which Defendants knew had been stolen or obtained in a manner constituting theft or extortion. Defendants concealed the theft and withheld the funds from RELATOR, the true owner of the funds.

78.     As a proximate result of Defendants' criminal violation of statutory duty, as set forth above, RELATOR has suffered actual, special and general damages as set forth herein, including treble damages and attorney's fees.

## COUNT IV
### (Breach of Covenant of Quiet Enjoyment)

79.     RELATOR re-alleges and incorporates herein the allegations of all preceding paragraphs above as though fully set forth by this reference.

80.     RELATOR, by virtue of her rental of the Subject Premises and the Agreement, RELATOR had at all relevant times, a property interest in the Subject Premises.  Defendants' conduct in fraudulently forcing RELATOR to pay for utilities, failing to make repairs which Defendants knew compromised the habitability of the Subject Premises, removing amenities or forcing RELATOR to share them with other tenants, and Defendant's illegal intrusions and visits into the Subject Premises interfered with RELATOR's quiet enjoyment of the Subject Premises.

81.     By the acts and omissions described above, Defendants interfered with, interrupted, and deprived RELATOR of the full and beneficial use of the Subject Premises and disturbed RELATOR's peaceful possession of the Subject Premises.

82.     These acts of interference, interruption, deprivation, and disturbance by Defendants amount to a breach of the covenant of quiet enjoyment implied in all rental agreements, and codified in California Civil Code section 1927.

83.     As a direct and proximate result thereof, RELATOR has suffered, and continue to suffer, pain, discomfort, annoyance, inconvenience, anxiety, economic loss, loss of use of the Subject Premises, and mental anguish, all to her detriment in amounts to be determined at trial.

## COUNT V
### (Unlawful Business Practices)

84.     RELATOR re-alleges and incorporates herein the allegations of all preceding paragraphs as though fully set forth by this reference.

85.     RELATOR brings this cause of action under Business and Professions Code § 17200 et seq. as a private person affected by the acts described in this Complaint.

86.     RELATOR, in bringing this action, is suing as an individual, and on behalf of the public at large.

87.     At all times relevant herein, Defendants and each of them were conducting a business under the laws of the State of California.  In conducting said business, Defendants were obligated to comply with applicable California and local laws.

88.     By failing to comply with State and local law and common law obligations relating to lessors of residential premises, as alleged herein, all of which resulted in the unlawful charges to RELATOR and fraud against RELATOR and the Government as heretofore alleged, Defendants have acted in contradiction to the law and are engaged in unfair and unlawful business practices.

89.     California Business and Professions Code section 17200 *et seq*., prohibits unfair competition in the form of any unlawful, unfair, deceptive or fraudulent business practice.

90.     RELATOR is informed and believes and thereupon allege that the acts of Defendants as described herein, constitute an unlawful business practice and unfair competition in violation of California Business and Professions Code, Sections 17200 *et seq.*

91.     RELATOR is informed and believes and thereupon alleges that Defendants, as a pattern and practice engage in such unlawful business practice as aforementioned, directly having effect upon other members of the public to whom Defendants have legal obligations.

92.     RELATOR is informed and believes and thereupon allege that Defendants have been unjustly enriched by their violations of their legal obligations as landlords and lessors of residential property and related provisions of the Business and Professions Code, which thereby justifies the award of restitution in an amount to be proven at trial, including but not limited to attorney fees and injunctive relief, enjoining Defendants from future unlawful or unfair business practice.

## COUNT VI
### (Common Count)

93.     RELATOR re-alleges and incorporates all prior allegations as though fully set forth herein.

94.     Defendants received money, rent and the side payments, that was intended to be used for the benefit of Relator.

95.     Such money was not used for the benefit of Relator.

COMPLAINT FOR VIOLATION OF 31 U.S.C. § 3729, OTHER CAUSES AND JURY DEMAND
Page 16 of 23

96.     Defendants have not returned any portion of such money to Relator or the United States.

97.     As a result, Relator is entitled to restitution of all side payments from Defendants in an amount to be proven at trial.

## COUNT VII
### (Intentional Infliction of Emotional Distress)

98.     RELATOR re-alleges and incorporates all prior allegations as though fully set forth herein.

99.     The acts of Defendants, as heretofore alleged were extreme and outrageous and done with conscious disregard for the rights of RELATOR.  Defendants knew that RELATOR was susceptible to additional discomfort as a result of the conduct described, knew that the conduct adversely affected RELATOR and her family, had the wherewithal to avoid the conduct, yet consciously failed and refused to do so.

100.    As a direct and proximate result of Defendants' conduct, RELATOR has suffered, and continues to suffer, severe mental, emotional, and physical distress, pain, and suffering, all to RELATOR's general damage, in an amount to be proven at trial.  RELATOR is entitled to punitive damages due to the oppressiveness and maliciousness of Defendants' acts and the fact the Defendants knew that such acts would have severe health and safety impacts on RELATOR and her family.

## COUNT VIII
### (Negligence)

101.    RELATOR re-alleges and incorporates all prior allegations as though fully set forth herein.

102.    By reason of the landlord-tenant relationship between Defendants and RELATOR, Defendants, and their agents, owed RELATOR a duty to exercise reasonable care in the ownership, management, inspection, and control of the Subject Property, which included a statutory duty to comply with all applicable laws governing RELATOR's rights as a tenant and all duties listed below.  Defendants also owed a duty to exercise reasonable care in maintaining the Subject Property and Subject Premises free of defects and/or hazards and in inspecting the Subject Property and Subject Premises for same, so as to preclude any persons, including RELATOR and her family, from unreasonable risk of harm.  Defendants also owed a duty to warn RELATOR of any potential and non-obvious hazards.

103.    The duty to exercise reasonable care owed by Defendants, and each of them, to RELATOR also

included, but was not limited to the following duties: the duty to provide RELATOR with legal, tenantable housing, fit for human occupancy; the duty to refrain from interfering with RELATOR's full use and quiet enjoyment of the rented residence; and the duty to comply with all applicable laws governing RELATOR's rights as a tenant.

104.     Defendants, by the acts and omissions alleged herein, were negligent and careless and thereby breached said duties. Defendants also breached their duties to RELATOR by failing to inspect the Subject Property and Premises, to repair the Subject Property and Subject Premises properly, to maintain the Subject Property and Subject Premises free of defects and hazards, and to cover the costs of electricity, gas and water and garbage services necessitated by the occupancy of RELATOR and her family at the Subject Premises.

105.     As a direct and proximate result of these breaches of duty by Defendants, RELATOR suffered actual and special damages as herein alleged.

106.     The aforementioned duties breached by Defendants were breached with knowing and/or reckless disregard for RELATOR's rights and/or safety and/or health and therefore justify an award of substantial exemplary and punitive damages in an amount to be proven at trial.

## COUNT IX
### (Nuisance)

107.     RELATOR re-alleges and incorporates all prior allegations as though fully set forth herein.

108.     RELATOR, by virtue of her rental of the Subject Premises and the Agreement, had at all relevant times, a property interest in the Subject Premises. Defendants' conduct in creating and maintaining a nuisance in the manner described herein, was injurious to RELATOR's health, offensive to RELATOR's senses, and interfered with her comfortable enjoyment of life, personal property, and her interest in the Subject Premises.

109.     Defendants created and maintained the deficient conditions in the Subject Property by failing to correct or repair defective conditions. Defendants' conduct in maintaining the Subject Premises and Subject Property in a hazardous, unhealthy and offensive state was grossly negligent and Defendants should have known that regular upkeep would be required to maintain the habitability of the Subject Premises.

110.    Defendant also committed nuisance intentionally by retaking RELATOR's parking space, causing the back yard to be shared with other tenants, and storing Defendant's belongings infested with noxious biological contaminants in spaces within the Subject Premises.

111.    As a direct, legal and foreseeable result of the conduct of Defendants, as set forth above, RELATOR suffered special and general damages as set forth herein.

112.    The Defendants' conduct, as set forth herein, was grossly negligent and through reasonable and necessary inspections it would have been readily apparent that the injury, discomfort, and annoyance would unavoidably result to RELATOR.  Defendants therefore acted with willful and conscious disregard for the rights and safety of RELATOR.  Defendants' conduct was also oppressive and despicable, and said conduct constituted a cruel and unjust hardship upon RELATOR.  Therefore, RELATOR request substantial punitive damages to be proven at trial.

## COUNT X
### (Breach of the Implied Warranty of Habitability)

113.    RELATOR re-alleges and incorporates all prior allegations as though fully set forth herein.

114.    At all relevant times herein, numerous defective living conditions have existed, and continue to exist, at the Subject Property.  These defective conditions include, but are not limited to lack of electricity, gas and water and garbage service to the unit and the above mentioned physical defects cited by Housing Authority inspectors and the San Francisco Department of Building Inspection.

115.    The defective conditions stated above constitute violations of state and local housing laws and pose severe health, safety and fire hazards.  The defective conditions materially affected RELATOR's living conditions.  State and local agencies, including but not limited to the Housing Authority and San Francisco Department of Building Inspection, have cited the Defendants for unsafe conditions and code violations as described above.

116.    Defendants had actual and constructive notice of each of the defective conditions described herein at all times relevant to this Complaint.  Despite such notice, Defendants failed to take the steps necessary to repair said conditions at all times relevant to this Complaint.

117.    RELATOR paid Defendants monthly rent during the time RELATOR occupied the Premises.  Defendants also received subsidy payments during the time RELATOR occupied the Premises.

118.    RELATOR did nothing to cause, create or contribute to the existence of the defective conditions.

119.    By Defendants' breach of the warranty of habitability, Defendants breached a duty imposed on all residential landlords by state and local law and Department of Housing and Urban Development regulations.  In failing to repair the defective conditions detailed above, Defendant acted unreasonably.

120.    As a direct and proximate result of Defendants' breach, the RELATOR has suffered, and continues to suffer pain, anxiety, annoyance, inconvenience, distress, economic loss, loss of use and property damage, all to her detriment in amounts to be determined at trial.

121.    The conduct of Defendants' alleged above was deliberate, willful and malicious. Defendants acted, or failed to act, deliberately and in conscious disregard of the rights and safety of the RELATOR.  By reason thereof, RELATOR is entitled to punitive damages in an amount to be determined at trial.

## COUNT XI
### (Violation of Civil Code § 1940.9)

122.    RELATOR re-alleges and incorporates all prior allegations as though fully set forth herein.

123.    Defendant did not provide RELATOR with her own electricity, gas and water meter such that her meter measured only the electricity, water and gas service to RELATOR's dwelling unit.  Defendant or her agent had knowledge that gas or electric service provided through RELATOR's meter served an area outside RELATOR's dwelling unit.  However, neither Defendant, nor her agents disclosed that condition. At no time did Defendants attempt to make any arrangements for reimbursement to RELATOR for RELATOR's excessive electricity, gas and water payments nor assignment of the electricity, gas and water account to Defendant.  Instead, at all times relevant to this Complaint, Defendants insisted that RELATOR pay all electricity, gas and water bills for service to the Subject Property.  RELATOR was able to obtain some reimbursement for some electricity, gas and water charges from the occupants of the other unit at the Subject Property.

124.    As a result, RELATOR suffered financial harm in the amount of all unreimbursed electricity, gas and water charges she paid for which she was not reimbursed by the occupants of the other unit at the Subject Property.

## COUNT XII
### (Breach of Contract)

125.    RELATOR re-alleges and incorporates all prior allegations above as though fully set forth herein.

126.    RELATOR was a third party beneficiary of the HAP Contract between Defendants and the Housing Authority.

127.    The Agreement and HAP Contract provided that Defendant would pay for the utilities which RELATOR and her family used.

128.    Defendants breached the Agreement and HAP Contract by forcing RELATOR to pay for all the electricity, gas and water services to the Subject Property, even those services provided to another tenant.

129.    Defendants breached the Agreement and HAP Contract by failing to make needed repairs.

130.    As a result of the herein stated breaches of the rental Agreement and HAP Contract, RELATOR has suffered financial damages in an amount to be proven at trial.

## COUNT XIII
### (Violation of Civil Code § 1942.4)

131.    RELATOR re-alleges and incorporates all prior allegations as though fully set forth herein.

132.    At all times relevant to this Complaint, the Subject Premises substantially lacked the affirmative standard characteristics listed in Section 1941.1 of the Civil Code, including but not limited to: effective waterproofing and weather protection [Section 1941.1(a)(1)]; a water supply approved under applicable law that is under the control of the tenant, capable of producing hot and cold running water; [Section 1941.1(a)(3)]; building, grounds, and appurtenances at the time of the commencement of the lease or rental agreement, and all areas under control of the landlord, kept in every part clean, sanitary, and free from all accumulations of debris, filth, rubbish, garbage, rodents, and vermin [Section 1941.1(a)(6)]; floors, stairways, and railings maintained in good repair [Section 1941.1(a)(8)].

133.    The conditions described above were not caused by an act or omission of RELATOR in violation of Civil Code sections 1929 or 1941.2.

134.    Defendants continued to demand and collect rent thirty-five days after Defendant was cited by the San Francisco Department of Building Inspections for the existence of the conditions described

above, thereby violating Civil Code section 1942.4.  As a direct and proximate result thereof, RELATOR has suffered economic loss to her detriment in an amount to be determined at trial. RELATOR is also entitled to payment of her attorney's fees and statutory penalties for Defendants' violation of this statute.

**WHEREFORE**, RELATOR prays for judgment as follows:

1. Judgment against Defendants for three times the amount of damages Relator and the United States have sustained as a result of Defendants' actions, plus a civil penalty of $11,000 for each violation of the Federal False Claims Act.
2. 25% of the proceeds of this action if the United States elects to intervene and 30% if it does not.
3. Three times any utilities RELATOR was forced to pay which were not consumed within her unit and which she was not reimbursed by the occupants of the other unit at the Subject Property.
4. All rent paid by RELATOR and the Government that was collected in violation of C.C. § 1942.4 and the requirement that the Subject Premises be certified for occupancy at all times relevant to this Complaint.
5. $5,000 statutory damages for each month in which Defendant collected rent in violation of C.C. § 1942.4.
6. General damages of $200,000 or according to proof.
7. Special damages of $200,000 or according to proof.
8. Her attorney's fees, costs and expenses.
9. Punitive and statutory damages.
10. Such other relief as the Court deems just and appropriate.

Respectfully Submitted,



Dated: October 13, 2018

_____

Jason Hain Esq.
Attorney for RELATOR,
KARLA ABEA

# EXHIBIT 1

SIERRA OFFICE SUPPLIES & PRINTING (916) 369-0491

T127?

# SAN FRANCISCO APARTMENT ASSOCIATION RESIDENTIAL TENANCY AGREEMEN

1. INTRODUCTION: *THIS LEASE IS FOR 371 STAPLES AV. SF CA 9412* ("Owner") rents to *DEBBIE ODWE*

| Security Deposit: | $ *2,500.00* |
| Rent Collected: | $ *2,400.00* |
| for the Period | *11/1/10* to *11/1/16* |
| Other: | $ |
| TOTAL CHARGES: | S |

("Tenant") and Tenant agrees to rent *KARLA AREA* , California, (the "Premises"). No other portion of the building (the "Building"), where the Premises is located, is included for lease unless expressly provided for in this Residential Te Agreement (the "Agreement"). The Premises is provided as ☒ Unfurnished or ☐ Furnished (see attached Furniture Inventory appliances provided at inception of the tenancy are described as: *WILLIAM AND ROLAND ZALDANA*

2. TERM: The term of this rental shall begin on *11-1-*___ and end on *11-1-16* , and thereafter sha month-to-month on the same terms and conditions as stated herein save any changes lawfully made until terminated.

3. PHYSICAL POSSESSION: If Owner is unable to deliver possession of the Premises at the commencement of the term, Owner not be liable for any damage caused thereby, nor shall this Agreement be void or voidable, but Tenant shall not be liable for an until possession is delivered.

4. RENT: The initial monthly base rent for ___ *(2,400.00)* . All rent is due and payable in advan the *1st* day of each and every month (the "Due Date") without offset, deductions or credits. All rent shall be p. designate in writing. Tenant agrees to *DEBBIE ODWE* or to such other person as Owner specifically requested by Owner. Rent shall be paid to Owner at the following address: *708 MARKEN WAY* or at such other place designated by Owner, during normal business hours *SF CA 94112* designated by Owner. In the event of noncompliance... [illegible watermarked text] ...understands and agrees the shall be paid with a single payment and that it is up to Tenant to collect individual checks independently in order to submit a com single payment. Nothing in this Paragraph shall be construed as a direction by Owner to make payment in a particular manner, in it is a promise by Tenant to pay in that manner as set forth herein. Tenant bears the risk of loss or delay of any payment made by Owner must receive mailed rent payments on or before the Due Date. Rent for any partial month shall be pro-rated at the r 1/30th of the monthly rent per day. Owner may apply any payment made by Tenant to any obligation of Tenant to ( notwithstanding any dates or other directions from Tenant that accompany any such payment. Any attempt by Tenant to allo payment in any other way shall be null and void, including the use or application of a restrictive endorsement on the face of any Owner will accept rent payments only from the actual Tenant(s). No third party checks will be accepted, nor shall Owner be lia Tenant in any way as a result of refusing any third party check. Should Owner elect to accept a third party check such acceptance not be construed as a waiver of this provision. Monthly rental checks received in prior months which the rent is due will be he cashed in a secured location and deposited on the first of the month.

5. SECURITY DEPOSIT: Before the commencement of the term, Tenant shall pay a security deposit of US $ *2,500* "Security Deposit") for the purposes set forth in Civil Code Section 1950.5. No trust relationship between Owner and Tenant is c because of the Security Deposit and Owner may commingle the Security Deposit with other funds. Owner may retai amounts of the Security Deposit as allowed by law including, but not limited to, amounts required to remedy future defaults tenant in any obligation under this Agreement to restore, replace, repair or return personal property or appurtenances, exclu ordinary wear and tear. Owner shall, within the time period allotted by law, refund any balance after such deductions to Tenar Tenant has vacated the Premises. Tenant shall not be deemed to have vacated the Premises for purposes of this Paragraph u Tenant returns to Owner all keys to the Premises, and b) Tenant has surrendered the Premises to Owner free and empty of all p claiming any right to possess the Premises. Any balance of the Security Deposit and an accounting of any deductions there from mailed to Tenant at the Premises unless Tenant provides, in writing to Owner, a mailing address to which the balance, if any, Security Deposit and the accounting shall be sent. Owner's check or other draft refunding any balance of the Security Deposit i made in the name of any or all of the original tenants regardless of the party who in fact made the deposit and regardless of the l of the persons then occupying the Premises. Tenant may not apply the Security Deposit, or any portion thereof, to the last m rent.

If required by law, Owner shall pay to Tenant simple interest as directed by such law, less deductions, on the amount he Security Deposit, provided this tenancy does not terminate before the Security Deposit has been held for a year. Upon Tenant's surre interest shall be made once a year commencing with the date the Security Deposit has been held for a year. Upon Tenant's surre the Premises, if the Security Deposit is insufficient to remedy Tenant's default in rent, to repair damages caused by Tenant, and t

Residential Tenancy Agreement - Page 1 o

©2010 by the San Francisco Apartment Association. ANY UNAUTHORIZED COPYING OR REPRODUCTION IS EXPRESSLY PROHI THIS DOCUMENT IS THE EXCLUSIVE PROPERTY OF THE SAN FRANCISCO APARTMENT ASSOCIATION.

*1) TENANT SHALL MAINTAIN THE YARD AND LANDSCAPE OF THE PROPERTY*

*Landlord has Right to Inspect House every 6 months (PG&E), GARBAG TENANT SHALL PAY UTILITY BILL*

## SFAA AGREEMENT TO RENT PARKING SPACE

1. Tenant agrees that the parking space ("parking space") is to be used for one fully functional automotive vehicle, license plate number _____. The registered and legal owner(s) of said automotive vehicle is _Karla Abel #5085 (2)_. The parking space is wholly contained in the area of the building described as follows: _Garage_ _____ _____. No other area may be used for parking. Tenant shall keep Owner informed of any changes in the make, model and license plate number of the vehicle parked in the parking space as well as changes in registered ownership of the vehicle. Nothing other than an automotive vehicle is to be placed in the parking space. No boats, trailers, campers or similar items shall be placed in the parking space. Nothing shall be stored in the parking space. The agreed upon value of the parking space, should it ever be severed from the tenancy, is US $ _____.

2. Tenant agrees that if any object other than a fully functional automotive vehicle is placed in the parking space, Owner shall have the right to remove the object or objects at the expense of the Tenant. Tenant hereby indemnifies and holds Owner harmless from any damages to which Tenant would otherwise be entitled to from Owner for the removal of any and all unauthorized objects from the parking space.

3. Owner shall not be responsible for any damage or injury to Tenant, or to any other person, or to any property, including but not limited to, Tenant's automotive vehicle nor shall Owner be responsible for any lost or stolen objects from the automotive vehicle of Tenant. Tenant agrees to hold Owner harmless from any claims for loss or damages no matter how caused. Tenant agrees to have automotive vehicle insurance on his or her automotive vehicle at all times during the term of this Agreement.

4. Tenant agrees that Tenant is renting the designated parking space only and that no bailment is created herein.

5. There shall be no repairing of automotive vehicle or any other equipment in or around the parking space. The washing of automotive vehicle is permitted only in the area designated by the Owner.

6. This Agreement is not assignable nor is Tenant permitted to let or sublet the parking space. No person other than Tenant shall be permitted to regularly or continuously use or occupy the parking space.

7. Upon the termination of this Agreement, Tenant is to return the parking space to the condition it was in upon the occupancy of the parking space by Tenant. All oil, grease, liquids and other lubricants and coolants shall be completely removed from the surface of the parking space. If the parking space is, at the discretion of the Owner, not sufficiently clean upon the vacation of the Tenant, the Owner may, at Owner's option, hire professional or other cleaners to return the parking space to its original condition. Owner may deduct from the Tenant's Security Deposit any amounts expended in the cleaning of the parking space after the termination of this Agreement.

8. Tenant will not in any way make alterations to the parking space, including, but not limited to, repainting lines or moving walls, fences or gates.

9. Tenant may not substitute parking spaces or trade spaces with another tenant in the building.

10. Tenant will permit the Owner or any agent of Owner free access at all reasonable times to the parking space for the purpose of inspecting and or making repairs, additions or alterations to the parking space or the Building.

11. Should the parking space assigned to Tenant involve "tandem parking" with another tenant, Tenant agrees to reasonably cooperate with other tenants and the Owner who are sharing and using the tandem parking spaces.

THE UNDERSIGNED HAVE READ THIS ENTIRE AGREEMENT, AGREE TO ALL ITS PROVISIONS, AND HAVE RECEIVED A COPY HEREOF.

Owner: _____ DATE: _10/28/10_

Tenant: _____ DATE: _10/28/10_

Tenant: _____ DATE: _10/28/10_

©2010 by the San Francisco Apartment Association                SFAA Agreement to Rent Parking Space - Page 1 of 1
THIS DOCUMENT IS THE EXCLUSIVE PROPERTY OF THE SAN FRANCISCO APARTMENT ASSOCIATION. ANY UNAUTHORIZED COPYING OR REPRODUCTION IS EXPRESSLY PROHIBITED.

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(     exp.9/30/2012)

---

## Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**
   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).
   b. The owner has entered in to a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**
   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.
   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**
   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.
   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household with out prior written approval of the owner and the PHA.
   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.
   d. The tenant may not sublease or let the unit.
   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**
   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.
   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:
   (1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or
   (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**
   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.
   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.
   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.
   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.
   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.
   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**
   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.
   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.
   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**
   a.     Maintenance

---

Previous editions are obsolete

form HUD-52641 (1/2007)
ref Handbook 7420.8

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b. **Utilities and appliances**

(1) The owner must provide all utilities needed to comply with the HQS.

(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

    (a) Pay for any utilities that are to be paid by the tenant.

    (b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**

a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1) Serious or repeated violation of the lease;

(2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

(3) Criminal activity or alcohol abuse (as provided in paragraph c); or

(4) Other good cause (as provided in paragraph d).

c. **Criminal activity or alcohol abuse.**

(1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

    (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

    (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

    (c) Any violent criminal activity on or near the premises; or

    (d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

    (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

    (b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d. **Other good cause for termination of tenancy**

(1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2) During the initial lease term or during any extension term, other good cause includes:

    (a) Disturbance of neighbors,

    (b) Destruction of property, or

    (c) Living or housekeeping habits that cause damage to the unit or premises.

(3) After the initial lease term, such good cause includes:

    (a) The tenant's failure to accept the owner's offer of a new lease or revision;

    (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

    (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

e. **Protections for Victims of Abuse.**

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control,

shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against a tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. **Eviction by court action**. The owner may only evict the tenant by a court action.

g. **Owner notice of grounds**
  (1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.
  (2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.
  (3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

9.   **Lease: Relation to HAP Contract**
If the HAP contract terminates for any reason, the lease terminates automatically.

10.   **PHA Termination of Assistance**
The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

11.   **Family Move Out**
The tenant must notify the PHA and the owner before the family moves out of the unit.

12.   **Security Deposit**
  a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting as security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)
  b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.
  c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.
  d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

13.   **Prohibition of Discrimination**
In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

14.   **Conflict with Other Provisions of Lease**

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

15. **Changes in Lease or Rent**

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:
   (1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;
   (2) If there are any changes in lease provisions governing the term of the lease;
   (3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

16. **Notices**

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

17. **Definitions**

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to an PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

1

## CERTIFICATE OF SERVICE

2

I hereby certify that a true and correct copy of the foregoing complaint for violations of the Federal False

3

Claims Act and all documentation of the facts underlying the allegations of said complaint has been

4

served upon the following on the date and in the manner listed below:

5

6

7

### VIA FEDERAL EXPRESS

8

Hon. Jeff Sessions

9

950 Pennsylvania Avenue, NW
Washington, DC 20530

10

### VIA HAND DELIVERY

11

12

Melinda Haag
United States Attorney

13

450 Golden Gate Avenue
San Francisco, CA 94102

14

15

16

17

18

19

20

21

22

23

Dated: October 13, 2018

By: _____

24

Jason Hain Esq.
LAW OFFICES OF JASON HAIN

25

100 Pine St., Suite 1250
San Francisco, CA 94111

26

Attorneys for RELATOR
KARLA ABEA

27

28